**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| GARY KAPPELMAN, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION |
| -against- | DEMAND FOR JURY TRIAL |
| INNOPHOS HOLDINGS, INC., KIM ANN MINK, GARY CAPPELINE, JANE HILK, LINDA MYRICK, KAREN OSAR, JOHN M. STEITZ, PETER T. THOMAS, and ROBERT J. ZATTA, | **COMPLAINT** |
| Defendants. | |

Plaintiff Gary Kappelman ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is a class action brought by Plaintiff, on behalf of himself and all others similarly situated, against Innophos Holdings, Inc. ("Innophos" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Innophos, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the proposed merger (the "Proposed Merger") between Innophos and an affiliate of One Rock Capital Partners, LLC ("One Rock").

2.      On October 20, 2019, Innophos entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which the Company's shareholders will receive $32.00 in cash

for each share of Innophos common stock they own (the "Merger Consideration")(the "Proposed

Merger").

3.     On December 6, 2019, in order to convince Innophos' shareholders to vote in favor

of the Proposed Merger, Defendants authorized the filing of a materially incomplete and

misleading definitive proxy statement (the "Proxy") with the Securities and Exchange Commission

("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.     In particular, the Proxy contains materially incomplete and misleading information

concerning: (i) financial projections for Innophos; and (ii) the valuation analyses performed by

Innophos' financial advisor Lazard Frères & Co. LLC ("Lazard"), in support of their fairness

opinion.

5.     The special meeting of Innophos shareholders to vote on the Proposed Merger is

currently scheduled for January 15, 2020 (the "Shareholder Vote").  The record date to participate

in the Shareholder Vote is for Innophos holders as of November 25, 2019.

6.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against

Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act.  Plaintiff seeks to

recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange

Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges

violations of Sections 14(a) and 20(a) of the Exchange Act.

8.     Personal jurisdiction exists over each Defendant either because the Defendant

conducts business in or maintains operations in this District, or is an individual who is either

present in this District for jurisdictional purposes or has sufficient minimum contacts with this

District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

9.    Venue is proper in this District under 15 U.S.C. § 78aa and 28 U.S.C. § 1391, because the Defendants transact business in this District, Innophos is incorporated in this District, and Defendants have received substantial compensation via Innophos, which is a Delaware corporation.

## PARTIES

10.    Plaintiff is, and at all relevant times has been, a holder of Innophos common stock.

11.    Defendant Innophos is a Delaware corporation with its principal place of business located at 259 Prospect Plains Road, Building A, Cranbury, New Jersey 08512. The Company produces specialty ingredient solutions for the food, health, nutrition, and industrial markets. The Company's common stock trades on the Nasdaq under the ticker symbol "IPHS".

12.    Individual Defendant Kim Ann Mink is, and has been at all relevant times, the Chief Executive Officer and President the Company and Chairman of the Board.

13.    Individual Defendant Gary Cappeline is, and has been at all relevant times, a director of Innophos.

14.    Individual Defendant Jane Hilk is, and has been at all relevant times, a director of Innophos.

15.    Individual Defendant Linda Myrick is, and has been at all relevant times, a director of Innophos.

16.    Individual Defendant Karen Osar is, and has been at all relevant times, a director of Innophos.

17.    Individual Defendant John M. Steitz is, and has been at all relevant times, a director

of Innophos.

18.    Individual Defendant Peter T. Thomas is, and has been at all relevant times, a director of Innophos.

19.    Individual Defendant Robert J. Zatta, Jr.is, and has been at all relevant times, a director of Innophos.

20.    The Individual Defendants referred to in ¶¶ 12-19 are collectively referred to herein as the "Individual Defendants" and/or the "Board", and together with Innophos they are referred to herein as the "Defendants."

## CLASS ACTION ALLEGATIONS

21.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and all other public shareholders of Innophos who will harmed by the consummation of the unfair Proposed Merger and/or the misinformed Shareholder Vote (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

22.    This action is properly maintainable as a class action for the following reasons:

(a)    The Class is so numerous that joinder of all members is impracticable.  As of the close of business on November 25, 2019, the record date for the Proposed Merger, Innophos had 19,690,774 shares of common stock outstanding held by hundreds to thousands of individuals and entities—the actual number of public shareholders of Innophos will be ascertained through discovery;

(b)    The holders of these shares are believed to be geographically dispersed through the United States;

4

(c)     There are questions of law and fact which are common to the Class and which predominate over questions affecting individual Class members.  The common questions include, *inter alia*, the following:

    i.  Whether the Proxy contains any statement which, at the time and in the light of the circumstances under which it was made, was false or misleading with respect to any material fact, or omitted to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which became false or misleading, in violation of Section 14(a) and SEC Rule 14a-9;

    ii.  Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

    iii.  Whether Plaintiff and other members of the Class suffered damages as a result of the materially false and misleading Proxy and unfair Merger;

(d)      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(e)     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(f)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of

the Class which would establish incompatible standards of conduct for the party opposing the Class;

(g)     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy; and

(h)     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### I.     Background and the Proposed Merger

23.     Innophos is an international producer of specialty ingredient solutions for the food, health, nutrition, and industrial markets. The Company's segments include Food, Health and Nutrition, Industrial Specialties, and Other. It has three principal product lines within these reporting segments: Specialty Ingredients, Core Ingredients, and Co-Products and Other. The Company's Food, Health, and Nutrition reporting segment as well as its Industrial Specialties reporting segment consist of products in the Specialty Ingredients and Core Ingredients product lines. The Other reporting segment consists of products in the Co-Products and Other product line.

24.     One Rock operates as private equity firm investing in business and environmental services, specialty manufacturing, chemicals, and process industries. One Rock makes controlling investments in companies with potential for growth and operational improvement using a rigorous approach that utilizes highly experienced operating partners to identify, acquire, and enhance businesses in select industries. One Rock works collaboratively with company management and its operating partners to develop a comprehensive business plan focused on growing the enterprise and its profitability to enhance long-term value. Iris Parent LLC and Iris Merger Sub 2019, Inc.

were formed on October 3, 2019 by entities affiliated with One Rock solely for the purpose of engaging in the transactions contemplated by the Merger Agreement and have not engaged in any other business activities.

25.    On October 21, 2019, Innophos issued a press release announcing the Proposed Merger, which states in relevant part:

### Innophos Enters into Definitive Agreement to Be Acquired by One Rock Capital Partners for $32.00 per Share

CRANBURY, New Jersey – (October 21, 2019) – Innophos Holdings, Inc. ("Innophos" or the "Company") (NASDAQ:IPHS), a leading international producer of essential ingredients, today announced that it has entered into a definitive agreement with an affiliate of One Rock Capital Partners, LLC ("One Rock"), a leading middle-market private equity firm, whereby One Rock will acquire all of Innophos' outstanding shares for $32.00 per share in cash in a transaction valued at approximately $932 million, including the assumption of debt. The transaction has been unanimously approved by Innophos' Board of Directors.

The offer price represents an 18% premium to the 30-trading day volume-weighted average closing share price of Innophos' common stock ended September 9, 2019, the last trading day prior to published market speculation regarding a potential transaction involving the Company.

"After careful consideration and a thorough review of our strategic alternatives, including an outreach program to multiple potential financial and strategic partners over several months, the Board determined that a sale to One Rock is in the best interest of all of our stakeholders," said Innophos Chairman, President and Chief Executive Officer Kim Ann Mink. "We remain confident that our transformational strategy is the right path forward for Innophos; however, executing on this strategy in an increasingly volatile macroeconomic and complex financial environment as a small-cap public company remains challenging and could take longer than initially expected. While we believe our long-term goals are achievable, we believe that the offer from One Rock is in the best interest of our stockholders as it will deliver immediate and certain value. We believe this transaction represents a winning proposition for all of our stakeholders, including our employees and customers."

Tony W. Lee, Managing Partner of One Rock, commented, "Innophos' innovative ingredient solutions are used by world-leading brands across a wide range of attractive food, health, nutrition and industrial markets. The Company has a strong foundation and a transformative growth strategy. In drawing upon One Rock's extensive experience, part of our goal is to maximize Innophos' growth potential by continuing to expand its presence in high-growth food, health and nutrition

markets, while further strengthening and optimizing its cash-generative core business. We look forward to working with Innophos to accomplish these goals and position the Company for continued success."

The definitive agreement includes a 30-day "go-shop" period, commencing immediately, during which Innophos, with the assistance of its legal and financial advisors, will solicit alternative acquisition proposals and potentially enter into negotiations with respect to alternative proposals. There can be no assurance that this process will result in a superior proposal or that any other transaction will be approved or completed. Innophos does not expect to disclose developments with respect to the solicitation process unless and until the Board makes a determination requiring further disclosure.

Under the terms of the definitive agreement, the Company has suspended the payment of all dividends.

The transaction will be financed through a combination of committed equity financing provided by affiliates of One Rock, as well as committed debt financing from several financial institutions.

The closing of the transaction is expected to occur in the first quarter of 2020, subject to stockholder and regulatory approvals and the satisfaction of customary closing conditions. Upon the completion of the transaction, Innophos will become a privately held company and shares of Innophos' common stock will no longer be listed on any public market.

Lazard is acting as exclusive financial advisor to Innophos, and Baker Botts LLP is acting as its legal counsel. Latham & Watkins LLP is acting as legal counsel to One Rock, and RBC Capital Markets, LLC is acting as its financial advisor with respect to the transaction.

26. The Merger Consideration represents inadequate compensation for Innophos shares. Indeed, the Merger Consideration represents a discount to the trading price of Innophos common stock at points in each of the one-month, three-month, six-month, nine-month, and twelve-month periods leading up to the announcement of the Merger Agreement. Further, in each of the two quarters leading up to the announcement of the Proposed Merger, Innophos outperformed expectations by significantly beating earning per share estimates. Given the Company's strong recent financial performance and bright economic outlook, it is imperative that shareholders receive the material information (discussed in detail below) that Defendants have

omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and cast an informed vote on the Proposed Merger.

**II.    The Proxy Omits Material Information**

27.    On December 6, 2019, Defendants filed the materially incomplete and misleading Proxy with the SEC. The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision in connection with the Proposed Merger.

*The Misleadingly Incomplete Financial Projections*

28.    First, the Proxy omits critical financial projections, including the net income projections for Innophos from both the February Projections and the Updated Management Projections (the "Net Income Projections"). Defendants elected to summarize the projections for Innophos but they excised and failed to disclose the Net Income Projections. Indeed, the notes to the projections tables concede that the disclosed metrics "should not be considered as an alternative to net income." Proxy at 61, 62. By disclosing these projections in the Proxy and withholding the Net Income Projections, Defendants render the summary of projections on pages 61-62 of the Proxy materially incomplete and provide a misleading valuation picture of Innophos. Simply put, net income projections are irreplaceable when it comes to fully, fairly, and properly understanding a company's projections and value.

29.    Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed—the others were concealed. If a proxy statement discloses financial projections and

valuation information, such projections must be complete and accurate. The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, Defendants have disclosed some of the projections but have omitted the Net Income Projections. This omission renders the summary of projections included in the Proxy misleadingly incomplete.

### The Misleadingly Incomplete Summary of Lazard's Fairness Opinion

30.    The Proxy describes Lazard's fairness opinion and the various valuation analyses performed in support of their opinion. Defendants concede the materiality of this information in citing Lazard's fairness opinion and their valuation analyses among the "material" factors the Board considered in making its recommendation to Innophos shareholders. Proxy at 49; *see also* Proxy at 54 ("The following is a summary of the material financial analyses reviewed with the Board in connection with Lazard's opinion, dated October 19, 2019."). However, the summary of Lazard's fairness opinion and analyses provided in the Proxy fails to include key inputs and assumptions underlying the analyses. Without this information, as described below, Innophos shareholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Lazard's fairness opinion in determining how to vote on the Proposed Merger. *See* Proxy at 54 ("Considering the data in the tables below without considering the full description of the analyses and reviews, including the methodologies and assumptions underlying the analyses and reviews, could create a misleading or incomplete view of Lazard's analyses and reviews."). This omitted information, if disclosed, would significantly alter the total mix of information available to Innophos shareholders.

31.    In summarizing the *Discounted Cash Flow Analysis* prepared by Lazard, the Proxy

fails to disclose the following key information used in the analysis: (i) the actual WACC/CAPM inputs underlying the discount rate range of 7.75% to 8.75%; (ii) the actual terminal values calculated; and (iii) the value of the net debt Lazard used to adjust the Company's enterprise value.

32.    These key inputs are material to Innophos shareholders, and their omission renders the summary of the *Discounted Cash Flow Analysis* incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" Id.  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Id. at 1577-78.

33.    Without the above-omitted information Innophos shareholders are misled as to the reasonableness or reliability of Lazard's analysis, and unable to properly assess the fairness of the Proposed Merger. As such, these material omissions render the summary of the *Discounted Cash Flow Analysis* included in the Proxy misleading.

34.     Next, in summarizing Lazard's *Precedent Transactions Valuation Analysis*, the Proxy fails to disclose the individual multiple of each transaction utilized in the analysis. A fair summary of a comparable companies or transactions analysis requires the disclosure of the individual multiple for each company or transaction used in the analysis—as illustrated by the summary of the *Public Trading Valuation Analysis* directly above. Merely providing the range of the multiples that a banker calculated without any further information is insufficient, as shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to present the Merger Consideration in the most favorable light. Accordingly, the omission of this material information renders the summary of this analysis provided in the Proxy misleading.

35.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.

### III.    The Proxy Misleads Shareholders Regarding the Value of the Company

36.     In 2017, the Company developed a five-year plan called the Vision 2022 plan. In February 2019, during the execution of the Vision 2022 plan, the company's management prepared a set of five-year financial projections for the Company (the "February Projections"). These projections were created in the normal course of business and reflect the Company management's best views of the Company's future financial performance.

37.     Over the course of the next 7 months, the Company hired Lazard to act as their financial advisor and engaged in the sales process that resulted in the Proposed Merger. On September 6, 2019, after the sales process was nearly complete and after One Rock submitted their non-binding final proposal of $32 per share, the Company's senior management created a new set of financial projections (the "Updated Management Projections"). The Updated Management

Projections represent a substantial downward revision to the February Projections.

38.    In downgrading from the February Projections to the Updated Management Projections, the Company management slashed growth rates, while increasing costs as a percentage of sales. To justify these measures, the Proxy provides various reasoning including: the outlook for the global phosphates industry demand in the markets that Innophos serves and the increased competitive environment, particularly in the Industrial Specialties segment of the Company's business; the Company's execution of improvements related to its Vision 2022 plan, including its progress with respect to value chain and manufacturing optimization initiatives; and the evolving forecasted capital expenditure requirements for the Company's business.

39.    However, during this same period leading up to the reduction of the Company's projections, the Company made positive statements regarding the same topics that served as the basis for the downward revisions.

40.    Regarding *the outlook for the global phosphates industry demand in the markets that Innophos serves and the increased competitive environment, particularly in the Industrial Specialties segment of the Company's business*, Individual Defendant Mink and CFO Mark Feuerbach stated on May 1, 2019 during the Company's First Quarter 2019 Earnings Call:

> Kim Ann Mink
>
> Yes. So we've actually more than covered our input cost so that - to-date. So that is good news and we've been very proactive. I would also mention that we came out with another price increase in - effective March 1, and our competitors have followed. We captured - just to give you a sense, Brett, we captured $8 million in Q1 as far as price increases. So we're off to a very good start. Now I think we've discussed in the past that we have increased the amount of some of our products, in particularly in the phosphate area and have put those into longer-term contracts, and that has served us quite well. And we've just gone through a lot of the contract negotiations particularly in the Food, Health and Nutrition business. And in fact, we have seen some nice price increases in that area, part of that $8 million that I just talked about.

. . .

Mark Feuerbach

So yes, we're seeing more success in the phosphates portion of the business at this point. But looking at the segment overall, you're right, the percentages look pretty much the same this quarter on a year-over-year basis right.

. . .

Kim Ann Mink

So in the phosphate area, we really had ground to make up. So I think that our assertiveness has been very successful and I think that's why you've seen more activity or the numbers really indicate that.

. . .

I think there's still more room to catch up because we are making improvements every day. And we are now - with our broader portfolio, we are able now to bring solutions to our traditional customers that only traditionally have bought phosphate, we're now bringing them a much broader portfolio, again becoming a more meaningful partner in this.

41. Regarding *the Company's execution of improvements related to its Vision 2022 plan, including its progress with respect to value chain and manufacturing optimization initiatives*, Individual Defendant Mink stated during the Company's First Quarter 2019 Earnings Call:

In addition, we continue to make solid progress executing against our Vision 2022 strategic roadmap and strategic pillars to build the critical capabilities that will transform Innophos' growth profile. Notably, during the quarter we advanced our efforts to transition to our lower-cost multi-faceted value chain structure, continued to develop innovative solutions that enhance our position in attractive food health and nutrition end markets and capitalize on our value selling commercial model.

. . .

Now we do look forward to keeping you updated as we execute on our plan in 2019 and continue on our journey to deliver our longer-term Vision 2022 goals.

. . .

So clearly, another acquisition in 2019 is going to keep us on track to achieving our 2022 target. When we put out our Vision 2022, if you kind of think about our target,

that would be meaning - maybe that $95 million of revenue per year starting in 2018, we already have started that in 2017. So the fact that we did not complete in acquisition in 2018 should not be interpreted as we've fallen off the track

And during the during the Company's Second Quarter 2019 Earnings Call on August 12, 2019, Individual Defendant Mink stated:

> Delivering this solid earnings, margin and cash performance in the face of top line headwinds is a strong testament to the effectiveness of our Vision 2022 strategy and strategic pillars framework, which are now deeply ingrained in the Innophos culture and highly interconnected.
>
> . . .
>
> While we manage the near term by focusing on the factors that we can control, we remain committed to executing on the strategic priorities that will advance Innophos on our transformational Vision 2022 journey.
>
> . . .
>
> Looking ahead, our focus for the balance of 2019 is to control the factors that we can control in order to manage the near-term headwinds. At the same time, we will execute on our strategic pillars to deliver on our profitability targets and realize our Vision 2022 goals for sustainable top and bottom line growth.
>
> . . .
>
> Despite this, we are confident that we are taking the tactical and strategic actions necessary to achieve our bottom-line growth goals for 2019, while forging ahead toward our longer-term Vision 2022 goals for sustainable top and bottom line growth.

This call was accompanied by a slide show presentation, which included the following slides:



## Executing Against Strategic Pillars to Realize Vision 2022 Goals

**Operational Excellence**

- Achieved initial sequential savings from new value chain structure

- Continued to advance our supply plan with the successful setup of 3rd party sourced MGA for Geismar PWA plant

- On track to deliver GAAP and adjusted diluted EPS improvement of $0.25 to $0.27 per share annual run rate by end of 2019

**Commercial Excellence**

- Pricing actions nearly offset effects of volume declines

- Leveraging value-selling model to capture pricing power

- Recently announced 6th consecutive quarterly price increase which will take effect August 15th

**Strategic Growth**

- SPARC program shifting portfolio mix to support future organic growth

- Selectively evaluating M&A to strengthen FHN platform consistent with strategic and financial criteria

Innophos Holdings, Inc. | Earnings Conference Call Second-Quarter 2019 | August 6, 2019    5

## Executing on Strategic Priorities to Drive Sustained Value

**Strategic Pillars**





- Leveraging new low-cost supply structure to reduce cost basis

- Proactively pursuing pricing efforts supported by value proposition

- Accelerating mix shift momentum with SPARC and inorganic growth opportunities

*On Track to Deliver Margin Growth in 2019 and Achieve Vision 2022 Goals*

Innophos Holdings, Inc. | Earnings Conference Call Second-Quarter 2019 | August 6, 2019    14

42.    Regarding the *evolving forecasted capital expenditure requirements for the Company's business* Individual Defendant Mink stated during the Company's First Quarter 2019 Earnings Call: "Capital investments are expected to be in line with 2018 to finalize the value chain and manufacturing optimization program that commenced last year. Average working capital is

also estimated to remain in line with 2018. We expect to - we continue to expect the effective tax rate in the 28% to 32% range." And Individual Defendant Mink and CFO Mark Feuerbach reiterated during the Company's Second Quarter 2019 Earnings Presentation:

Kim Ann Mink

In addition, we delivered strong free cash flow on improved working capital and reduced capital expenditures.

. . .

## Q2 2019 Performance Highlights

| | Q2 | | |
|---|---|---|---|
| | $m | Variance vs PY | |
| Sales | 185 | (22) | -10% |
| Gross Profit | 36 | — | —% |
| Gross Margin | 20% | 207 bps | |
| Net Income | 1 | (5) | -78% |
| Adj. Net Income | 9 | (2) | -22% |
| Adj. EBITDA | 30 | (1) | -3% |
| Adj. EBITDA% | 16% | 129 bps | |
| Diluted EPS | 0.07 | (0.24) | -78% |
| Adj. Diluted EPS | 0.43 | (0.12) | -22% |
| OCF | 26 | 18 | BIG |
| FCF | 20 | 24 | 711% |



- Sales below prior year as selling price increases were predominantly offset by the planned discontinuation of low-margin nutrition trading business, as well as a general weakening of demand including customer destocking, lost 2019 business due to Midwest flooding and continued "indirect" tariff effects
- Net Income down due **primarily** to a $6.6 million one-off tax charge
- Adjusted EBITDA flat sequentially and down slightly YOY due to lower volumes that were mostly offset by price increases; Adjusted EBITDA margin was up YOY reflecting improved mix and continued benefits of price and cost actions
- FCF was up significantly due to improved working capital and lower capital expenditures



Innophos Holdings, Inc. | Earnings Conference Call Second-Quarter 2019 | August 6, 2019          6

Mark Feuerbach

Additionally, because of our ongoing focus on working capital and lower capital expenditures, we delivered a very strong free cash flow performance.

## Q2 2019 Other Items

| Item | Q2 2019 | Q2 2018 | Comment |
|---|---|---|---|
| Net interest expense | $4m | $3m | Up due to higher market interest rates |
| Effective tax rate | 88% | 24% | High ETR in current period due to a $6.6 million one-off tax charge related to Dutch tax regulations enacted in the current quarter retroactive to 1/1/2018. Excluding the impact of one-off charge, ETR was 30% |
| Capital expenditures | $6m | $11m | Down significantly due to timing of value chain optimization as some of the larger Geismar utilities projects are scheduled for the second half of 2019 |
| Dividends | $9m | $9m | $1.92/sh. annual dividend rate maintained |
| Net Debt | $298m | $318m | Down $20m or 6% YOY due to improved free cash flow |
| Net Debt / LTM Adjusted EBITDA | 2.4x | 2.5x | Decrease due to lower net debt |

*Innophos*

Capital expenditures of $6 million in the quarter were down significantly due to the timing of the value chain optimization project as some of the larger utilities projects at Geismar are scheduled for the second half of 2019.

## Q2 2019 Cash Delivery



**Cash from Operations**
($ Millions)

8 · 21 · 43 · (9) · 26
Q2 · Q3 · Q4 · Q1 · Q2

**Free Cash Flow**
($ Millions)

(3) · 4 · 52 · (19) · 20
Q2 · Q3 · Q4 · Q1 · Q2

| | Opening | | | | | |
|---|---|---|---|---|---|---|
| Opening | 41 | 12 | 23 | 20 | 21 | |
| FCF | (3) | 4 | 52 | (19) | 20 | |
| Financing* | (25) | 6 | (55) | 20 | (9) | |
| Closing | 12 | 23 | 20 | 21 | 32 | |

*Includes cash spent on acquisition of businesses

| Cash Flow Bridge | Q2 | | | YTD | | |
|---|---|---|---|---|---|---|
| | $m | Variance | | $m | Variance | |
| Adj. EBITDA | 30 | (1) | -3% | 60 | (3) | -5% |
| Working Cap | 10 | 11 | BIG | (28) | 5 | 16% |
| Tax | (7) | 3 | 29% | (9) | 4 | 27% |
| Interest | (4) | — | -5% | (8) | (1) | -10% |
| Other | (3) | 5 | 60% | 1 | 2 | 183% |
| OCF | 26 | 18 | 225% | 17 | 7 | 75% |
| Capex | (6) | 5 | 48% | (16) | 11 | 40% |
| FCF | 20 | 24 | 711% | 1 | 18 | 106% |

### Quarterly Comments

- FCF improved significantly YOY due to working capital improvements and lower capex

*Innophos*

Moving on to slide 12, Q2 cash from operations was $26 million and free cash flow was $20 million, both very favorable to prior year due to working capital improvements and lower capital expenditures in the second quarter of 2019.

## 2019 Outlook

| Metric | Current Guidance | Prior Guidance | Key Assumptions |
|---|---|---|---|
| Revenue | (6% to 7%) YOY | (1% to 2%) YOY | • YOY volume decline from discontinued low margin nutrition business to impact comps through end of 2019, easing up in Q4<br>• US fertilizer sales impacted by Midwest flooding not expected to rebound in 2019, as previously projected<br>• Overall market softness to continue to impact both FHN and IS volumes<br>• IS pricing & volumes to continue to be affected indirectly by tariffs<br>• Above factors will be partially offset by positive year-over-year revenue contribution from price increases and new product wins |
| Adjusted EBITDA | 1% to 3% YOY | Same as current | • Reflects impacts of pricing and cost actions more than offsetting impacts from volume declines |
| Costs (GAAP & Cash Flow basis) | 2H' 19 < 1H'19 | Same as current | • Reflects wind down of non-recurring expenses adjusted for non-GAAP reporting purposes, including value chain transition expense and Mexico natural gas supply adjustment charges |
| Capital Investment | 15% to 20% Below 2018 | In-line with 2018 | • Reflects more efficient spending to finalize the optimization of the value chain and manufacturing program |
| Effective Tax Rate | 28% to 32% | Same as current | • Excludes the second quarter $6.6 million one-time Dutch tax charge |



Innophos Holdings, Inc. | Earnings Conference Call Second-Quarter 2019 | August 6, 2019                    13

Capital improvements are now expected to be $45 million to $50 million, which is 15% to 20% below 2018 capital spending. This compares to our prior expectations of spending in line with 2018 and reflects our ability to be more efficient with spending as we finalize the optimization of the value chain and manufacturing program. It is important to emphasize that this will not be at the expense of investing in high-return programs, which remains a priority.

. . .

Kim Ann Mink

So, Brett, all I would add is, as you know, we've made some changes at the top over the last couple of years over our operations, and this reflects sort of that operational excellence piece just becoming much more efficient, more effective in the way we look at our capital expenditures and the way we're doing our engineering. So, it's really a reflection of that. By no means are we taking – cutting a high return project by any means. I think it's just more fit, if you will.

. . .

And, yes, we do have, in our pipeline of acquisition targets, which are on the larger side, to be more transformative to be able to move that needle. And one thing I will say is all those that we are looking at, that we are assessing are asset-lite, require limited ongoing capital investment, are cash generative in nature. So, it really does present a favorable curve for paying down debt. So, we do believe, as we get into a more positive situation with our cash flow, and if you link that up to the targets that

we are looking at that are in that portfolio, we would become more comfortable, I would say. And I think there are targets out there.

43.    Therefore, listing these reasons as justification for the downward revisions to the February Projections, when they in fact did not justify such revisions, constitutes false and/or misleading statements. Moreover, since these listed reasons could not have served as a legitimate basis for the downward revisions resulting in the Updated Management Projections, the February Projections represent the more accurate financial projections for Innophos.

44.    The Updated Management Projections were provided to Lazard to use in their fairness opinion, but were not provided to any of the potential bidders. The Board then directed Lazard to use the Updated Management Projections, and not the February Projections, in the financial analyses underlying their fairness opinion: "Management of the Company has advised Lazard that the financial forecasts that were most recently prepared by management and presented to the Board represented the best currently available estimates and judgments as to the future financial performance of the Company. Accordingly, for the purposes of Lazard's analyses in connection with rendering its opinion, the Company directed Lazard to utilize such financial forecasts, which Lazard assumed, with the consent of the Company, had been reasonably prepared on bases reflecting the best currently available estimates and judgments as to the future financial performance of the Company." Proxy at 53.

45.    Therefore, the Updated Management Projections were prepared for the purpose of Lazard's fairness opinion, so that they could present the unfair Merger Consideration as "fair" to Innophos shareholders. These best estimates statements further mislead Innophos shareholders about the valuation of the Company, because the Updated Management Projections were not the Company's best estimates.

46.    Additionally, the Board's inclusion of the Lazard fairness opinion utilizing the

Updated Management Projections as a positive reason in recommending Innophos shareholders vote in favor of the Proposed Merger is misleading, because the Updated Management Projections misleadingly show the Merger Consideration to be fair in that fairness opinion. The Proxy concedes this information is material to a decision on the Proposed Merger and indicates the Board consulted with senior management and the financial advisors of Innophos. Accordingly, the Individual Defendants knew or should have known the differences between the Updated Management Projections and February Projections and how those differences would affect the fairness opinion. Therefore, the touting of Lazard's fairness opinion as a positive reason for the Proposed Merger misled shareholders to rely on the results of the valuation analyses that misrepresented the "fair" value of the Company.

47.    Finally, the implied per share equity value ranges found in the Lazard's valuation analyses utilizing the Updated Management Projections are misleading to shareholders, because they cause shareholders to believe the Company is worth less than its true value. Given that these statements are depicted with numeric specificity, they are a natural place for shareholders to turn for guidance when attempting to determine the value of the Company. Accordingly, by utilizing the lower Updated Management Projections as the inputs for the valuation analyses, the per share value ranges mislead shareholders to think that the Merger Consideration represented fair value for their Innophos shares.

48.    In sum, the Proxy contains materially false or misleading statements, in violation of Section 14(a) and Rule 14a-9.  The misleading Proxy is an essential link in the consummation of the unfair Proposed Merger, as the Proposed Merger could not be consummated without the dissemination of the Proxy. The Proxy harms Innophos shareholders, because it misleads them to accept the unfair Merger Consideration that is worth less than the true value of the Company.

## COUNT I

### Against All Defendants for Violations of Section 14(a) of the Exchange Act

49.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

50.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

51.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

52.    The omission of information from a proxy will violate Section 14(a) if other SEC regulations specifically require disclosure of the omitted information.

53.    Defendants issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which contained multiple materially misleading statements, identified above.

54.    Defendants knew or were negligent in not knowing that the Proxy was materially false or misleading. The Individual Defendants were obligated to and undoubtedly did review the

Proxy prior to the time it was sent to shareholders. Furthermore, the Individual Defendants were privy to and had knowledge of the both the financial projections for Innophos, the Company's financial results and future financial prospects, and management's statements regarding the Company's future prospects and the truth regarding the Company's future prospects. Indeed, Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the review of Innophos' financial projections and Lazard's valuation analyses and fairness opinion.

55.     The Individual Defendants were required to review Lazard's analyses in connection with their receipt of the fairness opinion, question Lazard as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there were no material misstatements or omissions.

56.     The Individual Defendants knew or were negligent in not knowing that the material information identified above was omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

57.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.

58.     The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.

59.     Innophos is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

60.     As a direct and proximate result of the dissemination of the misleading Proxy

Defendants used to obtain stockholder approval of the Proposed Merger, Plaintiff and the Class will suffer damages and actual economic losses (*i.e.* the difference between the value they received as a result of the Proposed Merger and the true value of their shares prior to the Proposed Merger) in an amount to be determined at trial. By reason of the misconduct detailed herein, Defendants are liable pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9.

## COUNT II

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

61.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

62.     The Individual Defendants acted as controlling persons of Innophos within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various material statements that Plaintiff contends are misleading.

63.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

64.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act

violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger. They were thus directly involved in preparing this document.

65.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

66.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

67.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will suffer damages and actual economic losses (*i.e.*, the difference between the value they received as a result of the Proposed Merger and the true value of their shares at the time of the Proposed Merger) in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Directing the Defendants to account to Plaintiff for all damages sustained as a result

of their wrongdoing;

       C.      Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

       D.      Granting such other and further relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 13, 2020

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel.: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

**ADEMI & O'REILLY, LLP**
Guri Ademi
Jesse Fruchter
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com
       jfruchter@ademilaw.com

*Attorneys for Plaintiff*

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Nemours Building
1007 N. Orange Street, Suite 1120
Wilmington, DE 19801
Tel.: (302) 984-3800

*Liaison Counsel for Plaintiff*